66

IN THE UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERYL HARDY,

Plaintiffs,

Hon.
Case No.

Vs.

Case: 2:25-cv-10244
Assigned To : DeClercq, Susan K.
Referral Judge: Patti, Anthony P.
Assign. Date : 1/27/2025
Description: CMP HARDY V.
SPECIALIZED LOAN SERVICING ET AL (TH)

SPECIALIZED LOAN SERVICING
MEB LOAN TRUST III, and
BANK OF AMERICA N.A
Defendants,

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff CHERYL HARDY, in pro per, submits this Complaint against the Defendants captioned above, and hereafter complain of the following:

**JURISDICTION AND VENUE**

1. This action arises under RESPA, violations of FDCPA, violation MCL 600.3204 et.al, Quite Title, Action to Set Aside Foreclosure, Unconscionable Contract, slander of Title, ect.

2. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1332, and also Plaintiff request this court to exercise supplemental jurisdiction over Plaintiffs state law claims pursuant to 28 USC §1367.

3. Venue lies in this Court under 28 U.S.C. § 1391(b).

**THE PARTIES**

4. That Plaintiff is indeed the owner of the property located in the City of Detroit, County of Wayne, 12755 Monte Vista, Michigan 48238.

5. That upon information and belief Defendant Specialized Loan Servicing was allegedly the servicer, who does business in the State of Michigan whose address is 6200 S. Quebec St, Ste. 300, Greenwood Village, CO, 07302.

6. Defendant MEB Loan Trust III is the alleged purchaser at foreclosure whose address is 300 Delaware Avenue, Wilmington, DE 19801.

7. Defendant Bank of America N.A., successor by merger to Lasalle Bank Midwest N.A., formerly known as Standard Federal Bank N.A. whose address is 1800 Tapo Canyon Rd., Simi Valley, CA 93063

**COUNT I**
**ALLEGATIONS AGAINST SPECIALIZED LOAN SERVICING**
**(Violation of Real Estate Settlement Procedures Act ("RESPA")**

8. On January 14, 2024, Plaintiffs sent to Defendant SLS a Qualified Written Request letter "QWR", which Requested information in accordance with section 1024.36 – Requests for information. **(Exhibit A-First QWR Letter)**

9. In Plaintiffs initial QWR letter, Plaintiffs sought, including but not limited to; (1) the name and/or identity of the current owner or assignee of

mortgage loan and/or note; (2) the address and telephone number for the current owner or assignee of my mortgage loan and/or Note; (3) documentation concerning the whereabouts of the original Note; (4) a copy of the original Note with any and all allonges; (5) a copy of the first 20 pages of the PSA (Pooling Servicing Agreement); (6) any and all documentation which provides proof that the Note was delivered to the trust within 30 days of closing on this Loan; (7) the name, position and address of an officer of the entity that is the owner or assignee of my mortgage loan and/or Note. **(Exhibit A).**

10. That, on Feb. 1, 2024, Defendant SLS Corporation acknowledged that it received Plaintiff's January 14, 2024 QWR on January 22,2024, and in response, it failed to provide the requested information in which it determined the following **(Exhibit B):**

> Pursuant to your request, the original and current holder of the mortgage loan is as follows:
>
> Original Creditor:
>
> Standard Federal Bank N.A.
> P.O. Box 3703
> Troy, MI 48007-9981
>
> Current Creditor:
>
> MEB Loan Trust III
> 300 Delaware Avenue, 9th Floor
> Wilmington, DE 19801
>
> As SLS is the servicer on behalf of the current owner, all correspondence will be handlod by SLS.
>
> The information requested regarding the original loan documents will not be provided, as the documents are located in a vaulted location and can be provided once the Note balance has been paid in full. Until then, you may compare the enclosed copies of the "wet ink" documents with the copies you received at the origination of this loan to ensure the documents are the same.
>
> All requests for any agreements other than those to which you are a signatory party are beyond the scope of a Qualified Written Request ("QWR") and accordingly are not being provided. These requests include, but are not limited to, internal accounting procedures, vendor information, life of loan transfer information, contractual servicing agreements with investors, title opinions and publications by entities outside of SLS. We are not required to provide life-of-loan transfer information Non-signatory agreements, such as servicing and pooling agreements, fall outside the scope of a QWR and will not be addressed. SLS services this account pursuant to the terms of the Note and Deed of Trust/Mortgage and does not adhore to any additional stipulations indicated in your QWR as applicable.
>
> Due to the severity of the delinquency, the account has been referred to foreclosure. At this time, a sale date has not been set for the subject property.

11. On February 1,2024, SLS responded to Plaintiff's Jan. 14, 2024-QWR, in violation of the section 1024.36 – Requests for information, and did not forward the requested information asked for by the plaintiff within her QWR letter. **(Exhibit B-Response to QWR)**

12. On February 28, 2024, Plaintiffs sent SLS a second QWR, limiting its inquiry to 5 informational requests, in order to determine whether the mortgage and the note delivered to the trust on or before the date specified in the PSA and also provided SLS with the actual amendments to RESPA's Regulation X which specifies that the PSA is no longer confidential. **(Exhibit C-Second QWR)**

13. SLS received Plaintiff's second Feb. 28, 2024 QWR letter allegedly on March 4, 2024, and on April 8,2024 responded as follows **(Exhibit D):**

> Regarding the pooling agreement, pursuant to the Real Estate Settlement Procedures Act ("RESPA") 1024.36 paragraph 36(f)(1)(iv):
>
> The following are examples of requests for information that are overbroad or unduly burdensome.
>
> i. Requests for information that seek documents relating to substantially all aspects of mortgage origination, mortgage servicing, mortgage sale or securitization, and foreclosure, including, for example, requests for all mortgage loan file documents, recorded mortgage instruments, servicing information and documents, and sale or securitization information and documents.
>
>> Confidential, proprietary or privileged information. A request for confidential, proprietary or privileged information of a servicer is not an information request for which the servicer is required to comply with the requirements of § 1024.36(c) and (d). Confidential, proprietary or privileged information may include information requests relating to, for example:
>>
>> i. Information regarding management or profitability of a servicer, including information provided to investors in the servicer.
>> ii. Compensation, bonuses, or personnel actions relating to servicer personnel, including personnel responsible for servicing a borrower's mortgage loan account;
>> iii. Records of examination reports, compliance audits, borrower complaints, and internal investigations or external investigations; or
>> iv. Information protected by the attorney-client privilege.

14. In review of SLS's response to Plaintiff's second Feb28, 2024 QWR Letter, which they allegedly received on March 4, 2024, and on April 8,2024 responded, SLS again violated section 1024.36 – Requests for information due to the fact that the PSA is public record, filed with the SEC, and in no longer confidential under RESPA regulation X.

15. SLS failed to provide accurate information and/or provide the information sought in order to show its rights to service the note on behalf of the note holder.

16. Within all Plaintiff's QWR letters, Plaintiffs did not request "general corporation information of a servicer" which is considered confidential, proprietary, or privileged. See Section-by-Section Analysis, § 1024.36 (f) (1)(ii), 78 Fed. Reg. 10,759/-/60 (Feb. 14, 2013).

17. Defendant SLS never claimed that the PSA didn't exist, or that the PSA was unavailable.

18. Section 1463(a) of the Dodd-Frank Act amended RESPA to add section 6(k)(1)(D), which states that a servicer shall not fail to provide information regarding the owner or assignee of a mortgage loan within ten business days of a borrower's request. Proposed comment 36(a)-2 clarified that

if a borrower requests information regarding the owner or assignee of a mortgage loan, a servicer complies with its obligations to identify the owner or assignee of the mortgage loan by identifying the entity that holds the legal obligation to receive payments from a mortgage loan.

19. For these reasons, Plaintiff is entitled to recover actual damages, which includes the cost of mailing, travel cost to mail letters, cost of defending the RESPA claims, cost for research, statutory damages, costs, emotional distress for violations of the new request for information 12 U.S.C. § 2605(f). and section 1024.36 – Requests for information. Foreclosures, § 9.2.10 (4th ed. and 2013 Supp.)

## COUNT II
## UNCONSCIONABLE CONTRACT

20. In December of 2023, Defendants offered Plaintiff a loan modification in which defendant SLS wanted Plaintiff to pay $1,583.35 for 3 months, during the trial period, although Plaintiff only received Social Security disability, at a rate less than $1000.00 per month. **(Exhibit E- Loan Mod).**

2. The Trial Period Plan. On or before each of the following scheduled payment dates, I will pay SLS the amount set forth below ("Trial Period Payment"), which may include payment for Escrow Items, including real estate taxes, insurance premiums and other fees due and payable on my loan.

**Total Number of Payments: 3**

| Trial Period Payment Amount | Payment Schedule |
|---|---|
| $1,583 35 | 12/20/2023 |
| $1,583.35 | 01/20/2024 |
| $1,583.35 | 02/20/2024 |

The Trial Period Payment is an estimate of the payment that will be required under the modified loan terms, which will be finalized in accordance with Section 3 below. The actual payments under the modified loan terms, however, may be different.

21. On several occasions Plaintiff informed Defendant SLS that she could not afford to pay pursuant to the Trial terms of the loan modification due to her income. **(Exhibit F- SSI Benefits)**

22. The plaintiff could not and did not accept the terms of the loan modification because the terms were unconscionable in light of Plaintiffs' limited income.

23. Under the terms of the loan modification, the Plaintiff would be placed in a position in which she would automatically fail and/or default because:

(1) if she accepted the terms of the loan modification she would indeed fail due to her inability to pay the $1583.35 monthly payment;

(2) if she didn't accept the terms of the loan modification she would then be placed into foreclosure.

24. Plaintiff had no realistic alternative to acceptance of the term of the modification because the terms within the modification, which Defendant knew Plaintiff could not pay, would cause Plaintiff to lose interest in the property due to non-payment and/or default under the terms.

25. The terms of the loan modification were " so extreme as to shock

the conscience" considering the monthly payment terms being more than plaintiff's total gross documented monthly income and plaintiff no other alternative or solution to save her home.

26. SLS's Loan modification establishes procedural unconscionability because Plaintiff had no realistic alternative to accept SLS's terms to pay 1,583.35 per month and SLS did not provide any alternative options."

27. Also, substantive unconscionability exist surrounding SLS's loan modification trial payment terms because $1,583.35 was not substantively reasonable in light of Plaintiff's total gross income and Defendant having actual knowledge of Plaintiff's total income.

28. Therefore, Plaintiff request this court to Determine that Defendant SLS Loan modification was totally unfair and unconscionable pursuant to MCL 440.2302(2);

**COUNTIII**
**VIOLATION OF MCL 445.903(x)**

29. Defendant SLS used unfair and unconscionable practices violating MCL 445.903(x) by taking advantage of the Plaintiff's inability to reasonably protect her interests by reason of her disability.

30. In December of 2023, Plaintiff sought loan modification with

Defendant SLS in order to protect her interest in the property and avoid foreclosure proceedings. **(Exhibit E-Loan Modification)**

31. Plaintiff is disabled, has limited income, and her source of income is Social Security Disability, at a set rate less than $1000.00 per month, which Defendant SLS knew and was supplied income documentation when Plaintiff sought loan modification prior to foreclosure.

32. Defendant SLS took advantage of Plaintiff's inability to protect her interests due to her disability and/or limited income because of her disabilities, which prevented her from entering into the loan modification that exceeded her total monthly income.

33. Defendant SLS exercised unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce with plaintiff which was unlawful pursuant to MCL 445.903(1)(x).

**COUNT IV**
**VIOLATION OF FDCPA**

34. Plaintiff purchased her home with a mortgage loan through Standard Federal Bank N.A.

35. The Note, payable to Standard Federal Bank N.A, is a debt within the meaning of the FDCPA, 15 U.S.C. § 1692a(5), as it was an alleged

obligation of Plaintiff to pay money in return for the loan to purchase her primary residence.

36. On February 26, 2023, Plaintiffs sent a notice of bono fide and request for Validation to MEB Loan Trust III's Counsel Randall Miller, which MEB Loan Trust and/or Randal Miller failed to answer or validate the loan. **(Exhibit G- Notice of Dispute and Require for Validation)**

37. Defendant MEB Loan Trust III's actions of failing to validate the loan prior to foreclosure constitute false, deceptive, and/or misleading practices in an attempt to collect a debt, in violation of the FDCPA, 15 U.S.C. § 1692e.

38. Defendant MEB Loan Trust III acquired interest in the debt after SLS exercised the Default provisions of the mortgage, as the alleged servicers during the default process, and MEB Loan Trust III obtained assignment of the debt from Bank of America N.A while in default and therefore is a debt collector under the FDCPA.

39. Defendant MEB Loan Trust III is a Debt collector, as defined in H.R. Rep. No. 131, at 8 (emphasis added); see also S. Rep. 95-382, 95th Cong. 1st Session 4, reprinted in 1977 U.S.C.C.A.N. 1695, 1698 (1977).

40. Plaintiff has suffered damages and emotional distress as a result of

Defendant MEB Loan Trust III wrongful and deceptive acts, which caused injury to Plaintiffs.

41. Defendant MEB Loan Trust III is liable to Plaintiff under this Count for its FDCPA violations in an amount equal to or greater than: actual damages for each of Defendant's violations of the FDCPA, 15 U.S.C.§ 1692k (a)(1); damages for emotional distress; statutory damages in the amount of $1,000, 15 U.S.C. § 1692k(a)(2)(A); and the costs of this action, 15 U.S.C. § 1692k(a)(3).

**COUNT V**
**VIOLATION OF MCL 600.3204 et.al**

42. _On July 10,2003, Plaintiff established an equity line of credit with Standard Federal Bank N.A which had maturity date of July 20,2013.

43. Pursuant to an un-notarized Certificate from Bank of America's Assistant Secretary, Bank of America's Secretary stated (Exhibit H):

4. Effective September 12, 2005, **Standard Federal Bank National Association,** Charter Number 16660, changed its name to **LaSalle Bank Midwest National Association.**

5. Effective October 17, 2008, **LaSalle Bank Midwest National Association,** Troy Michigan, Charter Number 16660, merged into and under the charter and title of **Bank of America, National Association,** Charlotte, North Carolina, Charter Number 13044.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Association this 13th day of June, 2013

---

44. _The merger between Lasalle Bank Midwest National Association and Bank of America N.A, in 2008 was a voluntary merger between themselves.

45. That, Bank of America N.A failed to record its interest after merger contrary to *Federal Home Loan Mortgage Association v. Kelley, 2014 Mich. App. LEXIS 1272 (Mich. Ct. App. June 24, 2014).*

46. Because Bank of America obtained its mortgage interest through a voluntary transaction and/or merger without assistance, it was subject to the recording requirement under MCL 600.3204(3) immediately after the merger.

47. Bank of America N.A acquired Plaintiff's mortgage by voluntary merger of operations with another bank (Standard Federal Bank d/b/a Lasalle Bank Midwest), not by operation of law, and thus was required under MCL 600. 3204(3) to record its mortgage interest by assignment, but did not.

48. Further, Bank of American, who assigned the mortgage to MED Loan Trust III in order for them to foreclose, was deprived of the ability to assign any interest in a mortgage and note that was not perfected by prior recordation of its interest.

49. In *Slorp v. Lerner, Sampson & Rothfuss* (6th Cir. 2014) clarified that a non-party homeowner may challenge the validity of a mortgage

assignment if it affects the assignee's title. The court distinguished between Article III standing and common-law standing, emphasizing that a mortgagor can challenge an assignment's validity if it impacts the assignee's title, particularly in cases of alleged fraudulent assignments.

50. A non-party homeowner may challenge a putative assignment's validity on the basis that it was not effective to pass legal title to the putative assignee. *See Conlin v. Mortg. Elec. Registration Sys.*, 714 F.3d 355, 361 (6th Cir. 2013); *Livonia Props.*, 399 F. App'x at 102; *see also Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 353-54 (1st Cir. 2013); 6A C.J.S. *Assignments* § 132 ("The debtor may also question a plaintiff's lack of title or the right to sue.").

51. Defendant Bank of America's assignment to MEB Loan Trust III was not effective to pass legal title to MEB Loan Trust III in light of the gap in the chain of title which fails to show how Bank of America N. A acquired its interest in order to assign to MEB Loan Trust III.

52. There is no perfected record chain of title showing that Standard Federal changed its name to Lasalle Bank Midwest, and Lasalle Bank Midwest

merged with Bank of America after the name change, which is a major defect in the chain of title evidencing the assignment of the mortgage to comply with MCL 600.3204

53. Bank of America, the putative assignor in 2019 after merger, held neither a recorded interest in the mortgage or the attendant promissory note when it assigned an interest in the mortgage to MEB loan Trust III to foreclose.

54. In Kim v. JPMorgan Chase Bank, N.A., 493 Mich. 98, 825 N.W.2d 329 (Mich. 2012), the Michigan Supreme Court emphasized the necessity of recording a mortgage assignment before foreclosure by advertisement under MCL 600.3204. The court held that a mortgage acquired through a voluntary purchase agreement, rather than by operation of law, requires compliance with this statutory requirement. Failure to record the assignment before initiating foreclosure renders the foreclosure sale voidable.

55. Similarly, in Katulski v. Cpca Trust I (Mich. App. 2015), the Michigan Court of Appeals reiterated that a recorded chain of title is necessary for a valid foreclosure by advertisement. The court found that the foreclosing party must have a record chain of title evidencing the assignment of the mortgage to comply with MCL 600.3204.

56. In this case, there is no record chain of title evidencing where Bank of America acquired its interest after its merger with Lasalle Bank Midwest Nor proof of the note being negotiated to Bank of America by transfer of possession alone.

57. Bank of America violated MCL 600.3204 (3) because Bank of America was not the original mortgagee, who lacked a record chain of title evidencing the assignment of the mortgage from the original mortgagee to itself, who then assigned the mortgage to MEB Loan Trust III in 2019.

58. Bank of America, who was the party allegedly foreclosing the mortgage owned neither a recorded interest in the indebtedness secured by the mortgage nor was the servicing agent of the mortgage.

59. Bank of America's failure to record the assignment of its interest in the mortgage and note immediately after merger rendered the foreclosure voidable.

## COUNT VI
## ACTION TO SET ASIDE FORECLOSURE

60. In December 2023, the plaintiff sought loan modification from SLS to save her home.

61. However, the terms of SLS's Loan Modification were totally

unconscionable for Plaintiff to accept, which cause Plaintiff to be placed into foreclosure.

62. Plaintiff was placed into foreclosure as a result of her inability to accept the terms under the unfair and unconscionable contract terms of SLS.

63. In addition, Defendant MED Loan Trust III was not the owner of the Indebtedness as a result of the defects surrounding Bank of America's failure to perfect the chain of title prior to foreclosure.

64. Plaintiff was prevented from taking timely action to cure the default due to SLS's unconscionable loan modification terms which took advantage of Plaintiff disabilities and/or limited income as a result of her disabilities.

65. Further, SLS could not modify the mortgage or note on behalf of a non-holder, which also deprived SLS of the ability to create an agreement to modify the mortgage.

66. In **Wells Fargo Bank, N.A. v. Carssow-Franklin (In re Carssow-Franklin), 213 F.Supp.3d 577 (S.D. N.Y. 2016)**: The U.S. District Court for the Southern District of New York discussed the authority of Wells Fargo to modify a mortgage loan on behalf of Freddie Mac. The court explained the importance

of proving the authenticity of endorsements and the existence of a servicing agreement to establish authority.

67. Plaintiff was prejudiced as a result of Defendants statutory noncompliance under MCL 600.3204 and MCL 440.3118(1) because there was "a causal connection between the alleged fraud or irregularity in the foreclosure procedure and the ability plaintiff] might have had to preserve his property interest." *Diem*, 204 Mich App at 212.

**COUNT VII**
**VIOLATION OF UCC ARTICLE 3**

68. Plaintiff's note is a negotiable instrument under Article 3 of the Michigan Uniform Commercial Code. Such instruments can be "specially endorsed" or "endorsed in blank." Mich. Comp. Laws § 440.3205.

69. A special endorsement occurs when the endorser identifies a specific entity that may demand payment on the instrument. Mich. Comp. Laws § 440.3205(1). However, if the holder of an instrument endorses it without identifying a particular entity, then there is a blank endorsement, which means that any party holding the instrument may demand payment from it. Mich. Comp. Laws § 440.3205(2).

70. A "holder may convert a blank endorsement that consists only of a

signature into a special endorsement by writing, above the signature of the endorser, words identifying the person to whom the instrument is made payable." Mich. Comp. Laws § 440. 3205 (3).

71. However, a note endorsed in blank that is payable to the bearer can be enforced by the party in possession which Bank of America nor MEB Loan Trust III has proven.

72. Pursuant to UCC 1-201(8) **"Burden of establishing"** a fact means the burden of persuading the trier of fact that the existence of the fact is more probable than its nonexistence.

73. Bank of America nor MEB Loan Trust III met its burden of establishing the fact that they are in possession of the original note by blank endorsement and is not holders in due course with authority to enforce the note.

**COUNT VIII**
**VIOLATION OF MCL 440.3118(1)**

74. MCL 440.3118(1) states: Except as provided in subsection (5), an action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within 6 years after the due date or dates stated in the note or, if a due date is accelerated, within 6 years after the accelerated

due date.

75. In this case, and pursuant to the Note, the maturity date is 7-20-2013.

76. Defendant Bank of America and /or MEB Loan Trust III did not commence foreclosure on the matured note until November 2024, in violation of MCL 440.3118(1).

77. Defendants Bank of America and /or MEB Loan Trust III action to enforce the obligation of Plaintiff, to pay the note payable at a definite time, should have commenced within 6 years after the July 20,2013 due date stated in the note or, within 6 years after the accelerated due date." MCL 440. 3118(1).

78. Defendants Bank of America and /or MEB Loan Trust III action to enforce the obligation of Plaintiff was time barred which resulted in damages and or injury to plaintiff

**RELIEF SOUGHT**

For the reasons stated above, Plaintiff Cheryl Hardy , in pro per, demands judgment against Defendants as follows:

1. Order Defendant to provide the PSA to Plaintiff .

2. Award Clear title to the property to Plaintiff.

3. Reimburse plaintiff for fees, and cost for filing this action, etc.

4. Establish that both Defendants do not have a valid interest in the plaintiffs' property.

5. Award plaintiffs the sum of $1,000,000.00 as a result of defendant's unfair bank practices, violations of FDCPA, Slander, and violations of RESPA.

**JURY DEMAND**

Cheryl Hardy, in pro per, demands a trial by jury for all issues in this cause.

Date: 01/23/2025

Cheryl Hardy
CHERYL HARDY
SIGNED UNDER THE PENALITES OF PERJURY

EXHIBIT 'A'

2 pgs

CHERYL D HARDY
12755 MONTE VISTA ST
DETROIT, MICHIGAN 48238

To: SPECIALIZED LOAN SERVICING LLC
ATTN: CUSTOMER SERVICE
PO BOX 630147
LITTLETON, CO 80163-0147
Certified Mail No. 70221670000166324348

January 14, 2024

RESPA "QWR" and/or REQUEST FOR INFORMATION

Re: [ CHERYL D HARDY@ 12755 MONTE VISTA ST, DETROIT, MICHIGAN 48238, ( LOAN NO. 1019837634)

Dear: SPECIALIZED LOAN SERVICING LLC,

As servicer of the mortgage loan, please treat this as a "request for information" pursuant to the Real Estate Settlement Procedures Act, subject to the response period set out in Regulation X, 12 C.F.R.S 1024.36(d)(2)((i)(A), and a request under § 1641(f)(2)of the Truth in Lending Act. Please provide the following information:

1. Please provide the name and/or identity of the current owner or assignee of mortgage loan and/or note.

2. Please provide the address and telephone number for the current owner or assignee of my mortgage loan and/or Note.

3. Please provide documentation concerning the whereabouts of the original Note.

4. Please provide a copy of the original Note with any and all allonges.

1

5. Please provide a copy of the first 20 pages of the PSA (Pooling Servicing Agreement).

6. Please provide any and all documentation which provides proof that the Note was delivered to the trust within 30 days of closing on this Loan.

7. Please provide the name, position and address ofan officer of the entity that is the owner or assignee of my mortgage loan and/or Note.

Very truly yours,

January 14, 2024

/s/ [signature]
CHERYL D HARDY

Answer to First RESPA Request
7022 1670 0001 6632 4348

EXHIBIT 'B' 2 pgs

Specialized Loan
**Servicing**

Part of the Computershare Group

February 1, 2024

Cheryl D. Hardy
12755 Monte Vista St.
Detroit, MI 48238

RE: Loan Number: **xxxxxx7634**
Property Address: 12755 Monte Vista St.
Detroit, MI 48238

Dear Cheryl D. Hardy,

This letter is in response to your correspondence received by Specialized Loan Servicing LLC ("SLS") on January 22, 2024, regarding Request for Information for the above-referenced mortgage loan account.

In response to your correspondence, enclosed are copies of the Equity Line of Credit Agreement and a Mortgage for your review.

Pursuant to your request, the original and current holder of the mortgage loan is as follows:

Original Creditor:

Standard Federal Bank N.A.
P.O. Box 3703
Troy, MI 48007-9981

Current Creditor:

MEB Loan Trust III
300 Delaware Avenue, 9th Floor
Wilmington, DE 19801

As SLS is the servicer on behalf of the current owner, all correspondence will be handled by SLS.

The information requested regarding the original loan documents will not be provided, as the documents are located in a vaulted location and can be provided once the Note balance has been paid in full. Until then, you may compare the enclosed copies of the "wet ink" documents with the copies you received at the origination of this loan to ensure the documents are the same.

All requests for any agreements other than those to which you are a signatory party are beyond the scope of a Qualified Written Request ("QWR") and accordingly are not being provided. These requests include, but are not limited to, internal accounting procedures, vendor information, life-of-loan transfer information, contractual servicing agreements with investors, title opinions and publications by entities outside of SLS. We are not required to provide life-of-loan transfer information. Non-signatory agreements, such as servicing and pooling agreements, fall outside the scope of a QWR and will not be addressed. SLS services this account pursuant to the terms of the Note and Deed of Trust/Mortgage and does not adhere to any additional stipulations indicated in your QWR as applicable.

Due to the severity of the delinquency, the account has been referred to foreclosure. At this time, a sale date has not been set for the subject property.

Specialized Loan
Servicing
Part of the Computershare Group

If you have any questions regarding this information, please contact Customer Assistance toll free at 1-800-306-6062, Monday through Friday, 6:00 a.m. until 9:00 p.m. MT. We accept calls from relay services. We provide translation services for individuals who indicate a language preference other than English. Se habla español.

Sincerely,

Trinity, Teller ID #15202
Customer Care Support
Specialized Loan Servicing LLC

Enclosure(s)

**SPECIALIZED LOAN SERVICING LLC IS REQUIRED BY FEDERAL LAW TO ADVISE YOU THAT THIS COMMUNICATION IS FROM A DEBT COLLECTOR.**

**BANKRUPTCY NOTICE - IF YOU ARE A CUSTOMER IN BANKRUPTCY OR A CUSTOMER WHO HAS RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT: PLEASE BE ADVISED THAT THIS NOTICE IS TO INFORM YOU OF THE STATUS OF THE MORTGAGE SECURED BY THE SUBJECT PROPERTY. THIS NOTICE CONSTITUTES NEITHER A DEMAND FOR PAYMENT NOR A NOTICE OF PERSONAL LIABILITY TO ANY RECIPIENT HEREOF, WHO MIGHT HAVE RECEIVED A DISCHARGE OF SUCH DEBT IN ACCORDANCE WITH APPLICABLE BANKRUPTCY LAWS OR WHO MIGHT BE SUBJECT TO THE AUTOMATIC STAY OF SECTION 362 OF THE UNITED STATES BANKRUPTCY CODE. IF YOU RECEIVED A DISCHARGE OF THE DEBT IN BANKRUPTCY, WE ARE AWARE THAT YOU HAVE NO PERSONAL OBLIGATION TO REPAY THE DEBT. WE RETAIN THE RIGHT TO ENFORCE THE LIEN AGAINST THE COLLATERAL PROPERTY, WHICH HAS NOT BEEN DISCHARGED IN YOUR BANKRUPTCY, IF ALLOWED BY LAW AND/OR CONTRACT. IF YOU HAVE QUESTIONS, PLEASE CONTACT US AT 1-800-306-6057.**

**SUCCESSORS IN INTEREST - IF YOU ARE IN RECEIPT OF THIS COMMUNICATION PURSUANT TO YOUR STATUS AS A SUCCESSOR IN INTEREST TO THE SUBJECT PROPERTY, THIS NOTICE DOES NOT MAKE YOU LIABLE FOR THE MORTGAGE DEBT. UNLESS YOU ARE PERSONALLY LIABLE FOR OR HAVE ASSUMED THE MORTGAGE LOAN, YOU CANNOT BE REQUIRED TO USE YOUR ASSETS TO PAY THE MORTGAGE DEBT. THE LENDER HAS A SECURITY INTEREST IN THE PROPERTY AND A RIGHT TO FORECLOSE ON THE PROPERTY, WHEN PERMITTED BY LAW AND AUTHORIZED UNDER THE MORTGAGE LOAN CONTRACT.**

EXHIBIT 'C'
15 pgs

**CHERYL HARDY**
**12755 MONTE VISTA ST**
**DETROIT, MICHIGAN 48238**

To: SPECIALZED LOAN SERVICING LLC
6200 S. QUEBEC ST
GREENWOOD VILLAGE, CO 80111

**SECOND RESPA "QWR" and/or REQUEST FOR INFORMATION**

Re: [Borrower: **Cheryl Hardy**, Property: **12755 Monte Vista St, Detroit Michigan 48238**. Loan No: **1019837634**

Date: 02/28/2024

Dear: SPECIALZED LOAN SERVICING LLC

I am in receipt of your office's invalid response letter dated February 1,2023. Your office has blatantly failed to answer my QWR/ request for info, has not provided Me with the requested information (PSA, Copy of the Original Note with any and all endorsements), and have not answered my QWR/request for information under RESPA appropriately and/or pursuant to what those law specifies.

Under the amendments set forth by the Dodd-Frank Act, which is attached in part, for your review, the pooling and servicing agreement is no longer confidential proprietary or privileged information, and no longer listed as such. (**Exhibit A-** Bureau of Consumer Financial Protection amendment to Regulation X).

In response to my QWR/ request for information, your office specified

that the pooling and servicing agreement is considered "life of loan transfer information" and go beyond the scope of RESPA. However, I am of the belief that your office is in error on the issue.

Pursuant to 12 CFR § 1024.36 **(d)** ***Response to information request***—

(1) *Investigation and response requirements.* Except as provided in paragraphs (e) and (f) of this section, a servicer must respond to an information request by either:

**(i)** Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or

**(ii)** Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, **provides the basis for the servicer's determination**, and provides contact information, including a telephone number, for further assistance.

Under these circumstances, I again request the following information from your office:

1. Please provide a copy of the endorsed original Note, endorsed by the original payee Standard Federal Bank N. A, with any and all endorsements and/or allonges association with it.

2. Please provide a copy of the first 20 pages of the PSA (Pooling Servicing Agreement) which is no longer considered **confidential, proprietary or privileged information under the Dodd-Frank Act, which amended RESPA regulation X, and is directly related and pertains to your office's ability to service this loan.**

3. Please provide any and all documentation which provides proof that the Note was delivered to the trust within 30 days of closing on this Loan.

4. Please provide documentary proof of any and all assignments or endorsement of the note.

5. Please provide record chain of title concerning ownership of the original Note by possession via endorsement of the Note, with any and all allonges attached.

Very truly yours,

Date February 28, 2024

/s/ Cheryl Hardy

**CHERYL HARDY**

a borrower is provided to the borrower within five days along with contact information the borrower can use for further assistance. This provision was consistent with section 6(e)(1)(A) of RESPA, which requires servicers to provide written acknowledgment of a qualified written request within five days (excluding legal public holidays, Saturdays, and Sundays) "unless the action requested is taken within such period." Proposed § 1024.36(e) would have permitted a servicer to provide the information requested either orally or in writing. Proposed comment 36(e)-1 would have permitted servicers that provide information orally to demonstrate compliance by, among other things, including a notation in the servicing file that the information requested was provided or maintaining a copy of a recorded telephone conversation.

Because, as discussed above, the final rule requires borrowers to submit information requests in writing in order to gain the benefit of the information request procedures set forth in § 1024.36, the Bureau now believes it is appropriate and consistent with the consumer protection purposes of RESPA to require that servicers respond to borrowers' information requests in writing. Doing so will help ensure that there is a written record of both the borrower's request and the servicer's response, which the Bureau believes will reduce confusion regarding the accuracy of the information provided. The Bureau did not receive comment regarding proposed § 1024.36(e) and, for the reasons set forth above, is adopting § 1024.36(e) substantially as proposed, except that it no longer permits servicers to respond orally and clarifies that the contact information must include a telephone number. The Bureau is removing proposed comment 36(e)-1 from the final rule.

*36(f) Requirements not Applicable*

The Bureau proposed § 1024.36(f) to set forth the types of information requests to which the information request requirements would not apply.

*36(f)(1) In General*

Proposed § 1024.36(f)(1) would have provided that a servicer is not required to comply with the information request requirements set forth in § 1024.36(c) and (d) if the servicer reasonably makes certain determinations specified in §§ 1024.36(f)(1)(i), (ii), (iii), (iv) or (v). Specifically, subject to certain exceptions, a servicer would not be required to comply with information request requirements under § 1024.36 as to information requests that are duplicative, overbroad or unduly burdensome, or untimely, as well as requests for confidential, proprietary, general corporate or irrelevant information. A servicer would be liable to the borrower for its unreasonable determination that any of the listed categories apply and resulting failure to comply with proposed § 1024.36(c) and (d).

*36(f)(1)(i)*

Proposed § 1024.36(f)(1)(i) would have provided that a servicer is not required to comply with the information request requirements in proposed § 1024.36(c) and (d) with respect to an information request that requests information that is substantially the same as information previously requested by or on behalf of the borrower, and for which the servicer has previously complied with its obligation to respond to the information request. Proposed comment 36(f)(1)(i)-1 would have clarified that a borrower's request for a type of information that can change over time should not be considered substantially the same as a previous request for the same type of information. The Bureau proposed § 1024.36(f)(1)(i) to ensure that a servicer is not required to expend resources conducting duplicative searches for documents, as such a requirement could divert resources from responding to other requests.

One anonymous commenter urged the Bureau to withdraw proposed § 1024.36(f)(1)(i), claiming that the Bureau lacked authority to narrow the requirements listed in RESPA. The

Bureau's authority for § 1024.36 is discussed above. In addition, the Bureau believes that it would frustrate the consumer protection purposes of RESPA to require that servicers devote resources, which could otherwise be spent on responding to information requests that would benefit consumers, to respond to duplicative information requests. The Bureau therefore believes that § 1024.36(f)(1)(i) is necessary to achieve the purposes of RESPA, including of ensuring responsiveness to consumer requests and complaints and the provision and maintenance of accurate and relevant information. Accordingly, for the reasons set forth in the proposal and above, the Bureau is adopting § 1024.36(f)(1)(i) and comment 36(f)(1)(i)-1 substantially as proposed.

*36(f)(1)(ii)*

Proposed § 1024.36(f)(1)(ii) would have provided that a servicer is not required to comply with the information request requirements in proposed § 1024.36(c) and (d) with respect to an information request that requests confidential, proprietary, or general corporate information of a servicer. The Bureau proposed § 1024.36(f)(1)(ii) because it believed that the purpose of providing borrowers with a means to request information regarding a borrower's mortgage loan account would be frustrated by permitting borrowers to request confidential, proprietary, or general corporation information of a servicer. Proposed comment 36(f)(1)(ii)-1 would have provided examples of confidential, proprietary, or general corporate information. These include information requests regarding: management and profitability of a servicer; other mortgage loans than the borrower's; investor reports; compensation, bonuses, and personnel actions for servicer personnel; the servicer's training programs; investor agreements; the evaluation or exercise of any owner or assignee remedy; the servicer's servicing program guide; investor instructions or

requirements regarding loss mitigation options, examination reports, compliance audits or other investigative materials.

Industry commenters expressed support for proposed § 1024.36(f)(1)(ii), but urged the Bureau to make clear that servicers need not turn over privileged documents. Multiple industry commenters said that servicers should not be required to produce pooling and servicing agreements, as such agreements are confidential, proprietary and also costly to mail. In contrast, one consumer advocate commenter said that such agreements are not typically confidential or proprietary, yet important because servicers rely on such documents to make erroneous claims that they are not authorized to offer certain loan modifications. Consumer advocacy groups also asserted that proposed § 1024.36(f)(1)(ii), as a whole, gives servicers too much discretion which may increase servicers' nonresponsiveness. An anonymous commenter said it was unclear which information falls into proposed § 1024.36(f)(1)(ii) and also questioned the Bureau's authority to narrow the requirements of RESPA.

Having considered these comments, the Bureau is amending proposed § 1024.36(f)(1)(ii) to provide that servicers need not provide borrowers with information that is confidential, proprietary or privileged, as the Bureau believes that permitting information requests for such information could impede the ability of servicers to operate effectively. In addition, the Bureau believes that it would frustrate the consumer protection purposes of RESPA to require that servicers devote resources, which could otherwise be spent responding to information requests that would benefit consumers, to determining how to respond to information requests for confidential, proprietary, or privileged information that generally would not directly benefit the borrower, but might pose considerable disclosure risk to the servicer.

The final rule further removes the reference to general corporate information, and references to such information have been removed from the examples listed in final comment 36(f)(1)(ii)-1 as well. For example, because the Bureau does not believe that pooling and servicing agreements are typically kept confidential, final comment 36(f)(1)(ii)-1 no longer lists such agreements as examples. However, the Bureau notes that to the extent that a borrower requests such agreements, a servicer is not required to comply with the requirements of § 1024.36(c) or (d) if the servicer reasonably determines that any of the exclusions set forth in § 1024.36(f) apply. The Bureau's authority for § 1024.36 is addressed above.

*36(f)(1)(iii)*

Proposed § 1024.36(f)(1)(iii) would have provided that a servicer is not required to comply with the information request requirements in proposed § 1024.36(c) and (d) with respect to information requests that are not directly related to the borrower's mortgage loan account. The Bureau proposed § 1024.36(f)(1)(iii) because it believes the protection in it is appropriate to fulfill the purpose of the proposed rule, which is to provide a means for borrowers to obtain information from servicers regarding their own mortgage loan accounts.

A consumer group commenter argued that the proposal requires that borrowers state the information requested with too much specificity, arguing that a general request for information about the status of the borrower's loan should suffice. An anonymous commenter asserted that the Bureau proposes to improperly narrow the scope of information requests. The commenter reasoned that section 6(e)(1)(B) of RESPA requires servicers to respond to qualified written requests for information relating to the servicing of the loan. The commenter argued that the Bureau proposes to narrow that definition by adding the requirement that such requests must "directly" relate to the "mortgage loan account" for the loan.

By relieving servicers of the duty to respond to requests for information that are not directly related to the borrower's mortgage loan account, the Bureau does not intend to impose an obligation on borrowers to identify with specificity the precise document or data point the borrower is seeking. Rather, the point of this section is to assure that servicers' resources are focused on securing relevant information for borrowers by excluding requests for information that are not relevant to the borrower's account. For the reasons discussed above, the Bureau finds that § 1024.36(f)(1)(iii) is necessary to achieve the purposes of RESPA by ensuring that servicer resources that could be devoted to responding to information requests that benefit borrowers are not diverted to responding to information requests that would not result in consumer benefit. Accordingly, for the reasons set forth in the proposal and above, the Bureau is adopting § 1024.36(f)(1)(iii) as proposed. The Bureau is also adopting new comment 36(f)(1)(iii)-1, which includes examples of information that is not directly related to a borrower's loan account.

*36(f)(1)(iv)*

Proposed § 1024.36(f)(1)(iv) would have provided that a servicer is not required to comply with the request for information requirements in proposed § 1024.36(c) and (d) with respect to a request for information that is overbroad or unduly burdensome. The proposed rule would have defined "overbroad" and "unduly burdensome" for this purpose. It would have provided that an information request is overbroad if a borrower requests a servicer provide an unreasonable volume of documents or information to a borrower. The proposed rule stated that an information request is unduly burdensome if a diligent servicer could not respond to the request without either exceeding the maximum timeframe permitted by § 1024.36(d)(2)(ii) or incurring costs (or dedicating resources) that would be unreasonable in light of the

circumstances. The proposed rule would have further clarified that if a servicer can identify a valid information request in a submission that is otherwise overbroad or unduly burdensome, the servicer is required to respond to the information request that it can identify. Finally, the Bureau proposed comment 36(f)(1)(iv)-1 to set forth characteristics that may indicate if an information request is overbroad or unduly burdensome.

As discussed above for proposed § 1024.35(g)(1)(ii), during pre-proposal outreach, consumers, consumer advocates, servicers, and servicing industry representatives indicated to the Bureau that consumers do not typically use the current qualified written request process to request information. During the Small Business Review Panel outreach, small entity representatives expressed that typically qualified written requests received from borrowers were vague forms found online or forms used by advocates as a form of pre-litigation discovery. Servicers and servicing industry representatives indicated that these types of qualified written requests are unreasonable and unduly burdensome. Small entity representatives in the Small Business Review Panel outreach requested that the Bureau consider an exclusion for abusive requests, or requests made with the intent to harass the servicer.

The Bureau requested comment regarding whether a servicer should not be required to undertake the information request requirements in proposed § 1024.36(c) and (d) for information requests that are overbroad or unduly burdensome. Industry commenters supported the exclusion, but urged the Bureau to remove the requirement that servicers identify valid information requests in submissions that are otherwise overbroad or unduly burdensome. Industry commenters said servicers should not be required to parse through such submissions to locate a clear information request. One large trade association of mortgage servicers said that the requirement effectively subsumes the exclusion. Consumer group commenters generally

disfavored the exclusion. One commenter questioned the assertion that borrowers primarily use qualified written requests to obtain prelitigation discovery. One consumer group said the exclusion gives servicers too much discretion. Another said it requires borrowers to state their information requests with too much specificity. An anonymous consumer advocate said a request from a single borrower should not be so voluminous as to be burdensome for servicers to respond. Another consumer group commenter requested that the Bureau address situations in which the servicer erroneously determines that a submission is overbroad or unduly burdensome.

The Bureau proposed § 1024.36(f)(1)(iv), in part, because the Bureau believes that requiring servicers to respond to overbroad or unduly burdensome information requests from some borrowers may cause servicers to expend fewer resources to address requests that may be more clearly stated and more clearly require servicer attention. The Bureau was especially concerned about this in light of the proposed rule's requirement that servicers respond to an expanded universe of information requests, including requests for information that do not specifically relate to "servicing" as defined in RESPA, as implemented by this rule, as well as information requests asserted orally. While the final rule does not require that servicers undertake the information request procedures in § 1024.36(c) and (d) for oral submissions, it does not limit information requests to those related to servicing. Thus, the Bureau continues to believe that a requirement for servicers to respond to information requests that are overbroad or unduly burdensome may harm consumers and frustrate servicers' ability to comply with the new information request requirements. Finally, as stated in the proposal, the Bureau does not believe that the information request procedures should replace or supplant civil litigation document requests and should not be used as a forum for pre-litigation discovery. Accordingly, the Bureau is adopting § 1024.36(f)(1)(iv) and comment 36(f)(1)(iv)-1 substantially as proposed.

*36(f)(1)(v)*

Proposed § 1024.36(f)(1)(v) would have provided that a servicer is not required to comply with the information request requirements in proposed § 1024.36(c) and (d) for an untimely information request – that is, an information request delivered to the servicer more than one year after either servicing for the mortgage loan that is the subject of the request was transferred by that servicer to a transferee servicer or the mortgage loan amount was paid in full, whichever date is applicable. The Bureau proposed this provision to set a specific and clear time that a servicer may be responsible for responding to information requests for a mortgage loan.

Moreover, the Bureau proposed § 1024.36(f)(1)(v) to achieve the same goal that currently exists in Regulation X with respect to qualified written requests. Specifically, current § 1024.21(e)(2)(ii) states that "a written request does not constitute a qualified written request if it is delivered to a servicer more than one year after either the date of transfer of servicing or the date that the mortgage servicing loan amount was paid in full, whichever date is applicable."

One industry trade association expressed support for proposed § 1024.36(f)(1)(v). Consumer advocacy groups did not comment on proposed § 1024.36(f)(1)(v). For the reasons set forth above, the Bureau is adopting § 1024.36(f)(1)(v) as proposed with a minor technical amendment.

*36(f)(2) Notice to Borrower*

Proposed § 1024.36(f)(2) would have required that if a servicer determines that it is not required to comply with the information request requirements in proposed § 1024.36(c) and (d) with respect to an information request, the servicer must provide a notice to the borrower informing the borrower of the servicer's determination. The servicer must send the notice not later than five days (excluding legal public holidays, Saturdays, and Sundays) after its

determination and the notice must set forth the basis upon which the servicer has made the determination, noting the applicable provision of proposed § 1024.36(f)(1).

One credit union trade association disfavored the proposed requirement that a servicer send a notice informing the borrower that an information request falls into one of the enumerated exclusions. The commenter suggested that the Bureau permit servicers to send a standard notice informing borrowers that the servicer received the information request and is not required to respond.

The Bureau proposed § 1024.36(f)(2) because it believes that borrowers should be notified that a servicer does not intend to take any action on the information request. The Bureau also believes borrowers should know the basis for the servicer's determination. By providing borrowers with notice of the basis for the servicer's determination, a borrower will know the servicer's basis and will have the opportunity to bring a legal action to challenge that determination where appropriate. Accordingly, having considered the comment, the Bureau is adopting § 1024.36(f)(2) as proposed.

*36(g) Payment Requirement Limitations*

Proposed § 1024.36(g)(1) would have prohibited a servicer from charging a fee, or requiring a borrower to make any payment that may be owed on a borrower's account as a condition of responding to an information request. Proposed § 1024.36(g)(2) would have, however, permitted fees for providing payoff statements or beneficiary notices under applicable law. The Bureau proposed § 1024.36(g)(1) and (2) for three reasons. First, section 1463(a) of the Dodd-Frank Act added section 6(k)(1)(B) to RESPA, which prohibits a servicer from charging fees for responding to valid qualified written requests. Proposed § 1024.36(g) would have implemented that provision with respect to qualified written requests for information

relating to the servicing of a mortgage loan. Second, the Bureau believes that a servicer practice of charging for responding to an information request impedes borrowers from pursuing valid information requests, and that the prohibition is therefore necessary and appropriate to achieve the consumer protection purposes of RESPA, including ensuring responsiveness to borrower requests and complaints. Third, the Bureau learned from outreach with consumer advocates that, in some instances, servicers have demanded that borrowers make payments before the servicer will provide a borrower with information requested by the borrower or will correct errors identified by a borrower. The Bureau believes that a servicer is required to provide a borrower with information about the borrower's mortgage loan account notwithstanding the payment status of a borrower's account.

Some consumer advocacy group commenters expressed support for the fee prohibition, stating that the prohibition is statutorily required. In contrast, a large credit union trade association opposed the prohibition, noting that it bars fees for items for which credit unions routinely charge, such as fees for copies of cancelled checks and periodic statements. The trade association argued that the proposed rule should take the fact that a fee is legally permissible into account. A law firm that represents servicers argued that it would be unfair and economically burdensome to prohibit servicers from charging fees for duplicate statements, such as year-end statements and tax forms.

Having considered these comments, for the reasons stated above and in the proposal, the Bureau is adopting § 1024.36(g) as proposed, except that§ 1024.36(g)(2) no longer references payoff statements. The Bureau has removed the reference to payoff statements, as the final rule excludes such statements from information request requirements under § 1024.36 altogether.

*36(h) Servicer Remedies*

7022 1670 0001 6632 4416

**ALERT: SEVERE WEATHER AND EMERGENCY EVENTS ACROSS THE U.S. MAY DELAY FINAL D...**

# USPS Tracking®

**FAQs ›**

Second Request For RESPA

**Tracking Number:**

**Remove ✕**

# 70221670000166324416

**Copy** **Add to Informed Delivery (https://informeddelivery.usps.com/)**

## Latest Update

Your item was delivered to the front desk, reception area, or mail room at 12:25 pm on March 4, 2024 in ENGLEWOOD, CO 80111.

Feedback

**Get More Out of USPS Tracking:**

**USPS Tracking Plus®**

## Delivered

**Delivered, Front Desk/Reception/Mail Room**

ENGLEWOOD, CO 80111
March 4, 2024, 12:25 pm

**See All Tracking History**

What Do USPS Tracking Statuses Mean? **(https://faq.usps.com/s/article/Where-is-my-package)**

**Text & Email Updates**

**USPS Tracking Plus®**

**Product Information**

**See Less ^**

Track Another Package

Specialized Loan
**Servicing**

Part of the Computershare Group

EXHIBIT 'D'

12 pgs

April 8, 2024

Cheryl D. Hardy
12755 Monte Vista St.
Detroit, MI 48238

RE: Loan Number: **xxxxxx7634**
Property Address: 12755 Monte Vista St.
Detroit, MI 48238

Dear Cheryl D. Hardy,

This letter is in response to your correspondence received by Specialized Loan Servicing, LLC ("SLS") on March 4, 2024 regarding an incomplete response to your concerns associated with the above-referenced mortgage loan account.

Our records indicate that we previously responded to a similar dispute on February 1, 2023. SLS responded to your request and provided documents as requested. Enclosed is a copy of our previous response.

Your account was due for the August 20, 2013 contractual monthly payment when the account reached maturity on July 20, 2013, at which time payment in full was due. Due to the severity of the delinquency, the account has been referred for foreclosure. The foreclosure sale date is May 30, 2024.

Our previous response did not include the requested Assignment of Mortgage and Allonge to the Note, which are enclosed for your review.

SLS is unable to provide the date the Note was delivered to the Trust at this time. The investor and/or the loan has been sold several times, and we were only able to obtain the information from the current custodian (not the original custodian). The current custodian of the Note has provided the date they received the original note, on May 15, 2019.

Regarding the pooling agreement, pursuant to the Real Estate Settlement Procedures Act ("RESPA") 1024.36 paragraph 36(f)(1)(iv):

The following are examples of requests for information that are overbroad or unduly burdensome:

i. Requests for information that seek documents relating to substantially all aspects of mortgage origination, mortgage servicing, mortgage sale or securitization, and foreclosure, including, for example, requests for all mortgage loan file documents, recorded mortgage instruments, servicing information and documents, and sale or securitization information and documents.

> Confidential, proprietary or privileged information. A request for confidential, proprietary or privileged information of a servicer is not an information request for which the servicer is required to comply with the requirements of § 1024.36(c) and (d). Confidential, proprietary or privileged information may include information requests relating to, for example:
>
> i. Information regarding management or profitability of a servicer, including information provided to investors in the servicer.
> ii. Compensation, bonuses, or personnel actions relating to servicer personnel, including personnel responsible for servicing a borrower's mortgage loan account;
> iii. Records of examination reports, compliance audits, borrower complaints, and internal investigations or external investigations; or
> iv. Information protected by the attorney-client privilege.

Specialized Loan
**Servicing**

We have responded regarding the errors alleged on the account and the corrections made to the account, as applicable. We trust that we have responded to your concerns. You have a right to request the documents relied on by SLS in reaching the determinations communicated in this letter by contacting us at the number below, but please note that SLS has already enclosed them for your reference.

If you have any questions regarding this information, please contact Customer Assistance toll free at 1-800-306-6062, Monday through Friday, 6:00 a.m. until 9:00 p.m. MT. We accept calls from relay services. We provide translation services for individuals who indicate a language preference other than English. Se habla español.

Sincerely,

Michelle, Teller ID #18467
Customer Care Support
Specialized Loan Servicing

Enclosure(s)

**SPECIALIZED LOAN SERVICING LLC IS REQUIRED BY FEDERAL LAW TO ADVISE YOU THAT THIS COMMUNICATION IS FROM A DEBT COLLECTOR.**

**BANKRUPTCY NOTICE - IF YOU ARE A CUSTOMER IN BANKRUPTCY OR A CUSTOMER WHO HAS RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT: PLEASE BE ADVISED THAT THIS NOTICE IS TO INFORM YOU OF THE STATUS OF THE MORTGAGE SECURED BY THE SUBJECT PROPERTY. THIS NOTICE CONSTITUTES NEITHER A DEMAND FOR PAYMENT NOR A NOTICE OF PERSONAL LIABILITY TO ANY RECIPIENT HEREOF, WHO MIGHT HAVE RECEIVED A DISCHARGE OF SUCH DEBT IN ACCORDANCE WITH APPLICABLE BANKRUPTCY LAWS OR WHO MIGHT BE SUBJECT TO THE AUTOMATIC STAY OF SECTION 362 OF THE UNITED STATES BANKRUPTCY CODE. IF YOU RECEIVED A DISCHARGE OF THE DEBT IN BANKRUPTCY, WE ARE AWARE THAT YOU HAVE NO PERSONAL OBLIGATION TO REPAY THE DEBT. WE RETAIN THE RIGHT TO ENFORCE THE LIEN AGAINST THE COLLATERAL PROPERTY, WHICH HAS NOT BEEN DISCHARGED IN YOUR BANKRUPTCY, IF ALLOWED BY LAW AND/OR CONTRACT. IF YOU HAVE QUESTIONS, PLEASE CONTACT US AT 1-800-306-6057.**

**SUCCESSORS IN INTEREST - IF YOU ARE IN RECEIPT OF THIS COMMUNICATION PURSUANT TO YOUR STATUS AS A SUCCESSOR IN INTEREST TO THE SUBJECT PROPERTY, THIS NOTICE DOES NOT MAKE YOU LIABLE FOR THE MORTGAGE DEBT. UNLESS YOU ARE PERSONALLY LIABLE FOR OR HAVE ASSUMED THE MORTGAGE LOAN, YOU CANNOT BE REQUIRED TO USE YOUR ASSETS TO PAY THE MORTGAGE DEBT. THE LENDER HAS A SECURITY INTEREST IN THE PROPERTY AND A RIGHT TO FORECLOSE ON THE PROPERTY, WHEN PERMITTED BY LAW AND AUTHORIZED UNDER THE MORTGAGE LOAN CONTRACT.**

# EQUITY LINE OF CREDIT AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $50,000.00 | 07-10-2003 | 07-20-2013 | 9048182557 | 020B | 1315019 | 939 | |

References in the shaded area are for our use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** MAXEL HARDY SR (SSN: 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)
12755 MONTE VISTA ST
DETROIT, MI 48238

**Lender:** STANDARD FEDERAL BANK N.A.
CONSUMER LOAN DEPARTMENT
PO BOX 3703
TROY, MI 48007-9981

**CREDIT LIMIT:** $50,000.00

**DATE OF AGREEMENT:** July 10, 2003

**Introduction.** This EQUITY LINE OF CREDIT AGREEMENT ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through STANDARD FEDERAL BANK N.A.. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean STANDARD FEDERAL BANK N.A.. **You agree to the following terms and conditions:**

**Promise to Pay.** You promise to pay STANDARD FEDERAL BANK N.A., or order, the total of all credit advances and **FINANCE CHARGES**, together with all costs and expenses for which you are responsible under this Agreement or under the "Mortgage" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. **If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.**

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until July 20, 2013 ("Maturity Date"). All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon maturity. The draw period of your Credit Line will begin on a date, after the Opening Date, when the Agreement is accepted by us in the State of Michigan, following the expiration of the right to cancel, the perfection of the Mortgage, the receipt of all required certificates of noncancellation, and the meeting of all of our other conditions and will continue as follows: Until the Maturity Date. You may obtain credit advances during this period ("Draw Period"). You agree that we may renew or extend the period during which you may obtain credit advances or make payments. You further agree that we may renew or extend your Credit Line Account.

**Minimum Payment.** Your "Regular Payment" will equal the amount of your accrued **FINANCE CHARGES**. You will make 119 of these payments. You will then be required to pay the entire balance owing in a single balloon payment. If you make only the minimum payments, you will not repay any of the principal balance by the end of this payment stream. Your payments will be due monthly. An increase in the **ANNUAL PERCENTAGE RATE** may increase the amount of your Regular Payment. You agree to pay not less than the Minimum Payment on or before the due date indicated on your periodic billing statement.

**Balloon Payment.** Your Credit Line Account is payable in full upon maturity in a single balloon payment. You must pay the entire outstanding principal, interest and any other charges then due. **Unless otherwise required by applicable law, we are under no obligation to refinance the balloon payment at that time. You may be required to make payments out of other assets you own or find a lender, which may be us, willing to lend you the money. If you refinance the balloon, you may have to pay some or all of the closing costs normally associated with a new credit line account, even if you obtain refinancing from us.**

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied first to Finance Charges; then to late charges and other charges; and then to unpaid principal.

**Receipt of Payments.** All payments must be made by a check, automatic account debit, electronic funds transfer, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address on any business day will be credited to your Credit Line as of the date received.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of Fifty Thousand & 00/100 Dollars ($50,000.00), which will be your "Credit Limit" under this Agreement. **During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights.** You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Mortgage covering your principal dwelling. You understand that your Credit Limit is imposed solely for our protection and you agree to hold us harmless against any loss incurred for honoring a credit advance in excess of your Credit Limit.

**Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Mortgage or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Mortgage for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

**Credit Line Checks.** Writing a preprinted "Home Equity Credit Line Check" that we will supply to you.

**Requests in Person.** Requesting a credit advance in person at any of our authorized locations.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one of you telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor Home Equity Credit Line Checks in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Home Equity Credit Line Check.

**Post-dated Checks.** Your Home Equity Credit Line Check is post-dated. If a post-dated Home Equity Credit Line Check is paid and as a

result any other check is returned or not paid, we are not responsible.

**Stolen Checks.** Your Home Equity Credit Line Checks have been reported lost or stolen.

**Unauthorized Signatures.** Your Home Equity Credit Line Check is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Home Equity Credit Line Check.

**Transaction Violation.** Your Home Equity Credit Line Check is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the Home Equity Credit Line Check.

If we pay any Home Equity Credit Line Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Home Equity Credit Line Check. The Home Equity Credit Line Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Home Equity Credit Line Checks along with your periodic billing statements; however, your use of each Home Equity Credit Line Check will be reflected on your periodic statement as a credit advance. We do not "certify" Home Equity Credit Line Checks drawn on your Credit Line.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

**Credit Line Home Equity Credit Line Check and In Person Request Limitations.** The following transaction limitations will apply to your Credit Line and the writing of Home Equity Credit Line Checks and requesting an advance in person.

**Minimum Advance Amount.** The minimum amount of any credit advance that can be made on your Credit Line is $250.00. This means any Home Equity Credit Line Check must be written for at least the minimum advance amount.

**Authorized Signers.** The words "Authorized Signer" on Home Equity Credit Line Checks as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Lost Home Equity Credit Line Checks.** If you lose your Home Equity Credit Line Checks or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (800) 783-0300. You also can notify us at our address shown at the beginning of this Agreement.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein, all the terms and conditions of which are hereby incorporated and made a part of this Agreement: a Mortgage dated July 10, 2003, to us on real property located in WAYNE County, State of Michigan.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Mortgage, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

**Right of Setoff.** To the extent permitted by applicable law, we reserve a right of setoff in all your accounts with us (whether checking, savings, or some other account), including without limitation, all accounts you may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. You authorize us, to the extent permitted by applicable law, to charge or setoff all sums owing on this Agreement against any and all such accounts.

**Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement. It will show, among other things, credit advances, **FINANCE CHARGES**, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.** Periodic **FINANCE CHARGES** for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a **FINANCE CHARGE** on your Credit Line credit advances.

**Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** A daily **FINANCE CHARGE** will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the "daily balance" method. To get the daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid **FINANCE CHARGES**. This gives us the "daily balance."

**Method of Determining the Amount of FINANCE CHARGE.** Any **FINANCE CHARGE** is determined by applying the "Periodic Rate" to the balance described herein. Then we add together the periodic **FINANCE CHARGES** for each day in the billing cycle. This is your **FINANCE CHARGE** calculated by applying a Periodic Rate.

**Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** as follows. We start with an independent index which is the the highest Prime Rate as published in the Money Rates section of the Wall Street Journal. (the "Index"). We will use the most recent Index value available to us as of the last publishing date of the calendar month immediately preceeding the billing cycle date. any **ANNUAL PERCENTAGE RATE** adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Credit Line Account, we may designate a substitute index after notice to you. To determine the Periodic Rate that will apply to your account, we take the value of the Index, then divide the value by the number of days in a year (daily). To obtain the **ANNUAL PERCENTAGE RATE** we multiply the Periodic Rate by the number of days in a year (daily). This result is the **ANNUAL PERCENTAGE RATE.** The **ANNUAL PERCENTAGE RATE** includes only interest and no other costs.

The Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Adjustments to the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** resulting from changes in the Index will take effect MONTHLY. In no event will the corresponding **ANNUAL PERCENTAGE RATE** be more than the lesser of 21.000% or the maximum rate allowed by applicable law. Today the Index is 4.000% per annum, and therefore the initial Periodic Rate and the

corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line are as stated below:

**Current Rates for the First Payment Stream**

| Range of Balance or Conditions | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|
| All Balances | 4.000% | 0.01096% |

**Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.**

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set forth below:

**Annual Fee.** A nonrefundable Annual Fee of $50.00 will be charged to your Credit Line at the following time: Annually beginning on the second anniversary date of the credit agreement. Please note: annual fee is $50.00 effective with applications received 2-1-02 and later. Annual fee is $35.00 for applications received until and including January 31, 2002.

**Late Charge.** Your payment will be late if it is not received by us within **16 days after the "Payment Due Date" shown on your periodic statement.** If your payment is late we may charge you 5.000% of the unpaid amount of the payment.

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

(4) We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an **ANNUAL PERCENTAGE RATE** that is substantially similar to the rate in effect at the time the original index becomes unavailable. We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum **ANNUAL PERCENTAGE RATE** under your Credit Line Account is reached.

**Collection Costs.** We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes, subject to any limits under applicable law, attorneys' fees and costs adjudged by a court.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all Home Equity Credit Line Checks and any other access devices. Any use of Home Equity Credit Line Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of Home Equity Credit Line Checks or other Credit Line access devices not returned to us.

**Delay In Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us and return all Home Equity Credit Line Checks and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time without penalty, except we will be entitled to receive all accrued **FINANCE CHARGES**, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount

owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: STANDARD FEDERAL BANK N.A., CONSUMER LOAN DEPARTMENT, PO BOX 3703, TROY, MI 48007-9981.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

**Credit Information and Related Matters.** You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law. You agree that, upon our request, you will provide us with a current financial statement, a new credit application, or both, on forms provided by us. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Mortgage. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Notify Us of Inaccurate Information We Report To Consumer Reporting Agencies.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: STANDARD FEDERAL BANK N.A., CONSUMER LOAN DEPARTMENT, PO BOX 3703, TROY, MI 48007-9981

**For Indiana Residents Only.** Federal law applies to certain aspects of this Note, including, but not limited to, the interest rate and related charges. The law of the state where you and the Property are located will apply to the extent legally required. If any term of this Note violates any law or for some reason, is not enforceable, that term will not be part of this Note.

**Governing Law. This Agreement will be governed by and interpreted in accordance with federal law and the laws of the State of Michigan. This Agreement has been accepted by us in the State of Michigan.**

**Choice of Venue.** If there is a lawsuit, you agree upon our request to submit to the jurisdiction of the courts of Oakland County, State of Michigan.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Mortgage, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Mortgage or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "When Your Home Is On the Line: What You Should Know About Home Equity Lines of Credit," given with the application.

**BORROWER:**

X Maxel Hardy Sr
MAXEL HARDY SR, Individually

**Effective Disbursement Date:** ____________________

# BILLING ERROR RIGHTS

## YOUR BILLING RIGHTS

## KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

Your name and account number.

The dollar amount of the suspected error.

Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

LASER PRO Lending, Ver. 5.21.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2003. All Rights Reserved. - MI c:\appsLASERPRO\CFI\LPL\D25.FC TR-13150190 PR-10

# Allonge to Mortgage Note

Loan number: **1019837634 / 877442079**

Allonge to one certain Mortgage Note Dated: 07/10/2003

Executed By: MAXEL HARDY SR.

Original Amount: **$50,000.00**

Property Address: 12755 MONTE VISTA ST. DETROIT, MI 48238

---

Pay to the Order of:

Without Recourse:

**BANK OF AMERICA, NATIONAL ASSOCIATION, SUCCESSOR BY MERGER TO LASALLE BANK MIDWEST NATIONAL ASSOCIATION FORMERLY KNOWN AS STANDARD FEDERAL BANK NATIONAL ASSOCIATION**

By: Jose Alvaro Juarez Alcala

Name: JOSE ALVARO JUAREZ ALCALA

Title: OFFICER

# ASSISTANT SECRETARY'S CERTIFICATE

# OF

# BANK OF AMERICA, NATIONAL ASSOCIATION

The undersigned, Devra Lindgren, an Assistant Secretary of Bank of America, National Association (the "Association"), a national banking association organized and existing under the laws of the United States of America and having its principal place of business in the City of Charlotte, County of Mecklenburg, State of North Carolina, does hereby certify that:

1. Effective October 31, 1986, **Family Federal Savings and Loan Association,** Saginaw, Michigan, was merged into and under the charter and title of **Heritage Federal Savings Bank**, Taylor, Michigan.

2. Effective December 4, 1993, **Heritage Federal Savings Bank**, Taylor, Michigan, was merged into and under the charter and title of **Standard Federal Bank**, Troy, Michigan.

3. Effective October 5, 2001, **Standard Federal Bank**, Troy, Michigan, OTS Number 0161, merged into and under the charter of **Michigan National Bank**, Charter Number 16660, under the title **Standard Federal Bank National Association**.

4. Effective September 12, 2005, **Standard Federal Bank National Association,** Charter Number 16660, changed its name to **LaSalle Bank Midwest National Association**.

5. Effective October 17, 2008, **LaSalle Bank Midwest National Association**, Troy Michigan, Charter Number 16660, merged into and under the charter and title of **Bank of America, National Association**, Charlotte, North Carolina, Charter Number 13044.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Association this 13th day of June, 2013.

(SEAL)

Devra Lindgren
Assistant Secretary

2019270413 L: 55287 P: 511 ASG
09/23/2019 08:03:31 AM Total Pages: 3
Bernard J. Youngblood, Register of Deeds - Wayne County, MI
ELECTRONICALLY RECORDED

Prepared By and Return To:
Jake Okasuma
Collateral Department
Meridian Asset Services, LLC
3201 34th Street South, Suite 310
St. Petersburg, FL 33711
(727) 497-4650

APN/PIN# 1016045177

Space above for Recorder's use

Loan No: 3164160

9983708

# ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO LASALLE BANK MIDWEST, N.A., FORMERLY KNOWN AS STANDARD FEDERAL BANK, N.A.**, whose address is **1800 TAPO CANYON RD., SIMI VALLEY, CA 93063**, (ASSIGNOR), does hereby grant, assign and transfer to **MEB LOAN TRUST III**, whose address is **C/O U.S. BANK TRUST NATIONAL ASSOCIATION, 300 DELAWARE AVENUE, 9TH FLOOR, WILMINGTON, DELAWARE 19801**, (ASSIGNEE), its successors, transferees and assigns forever, all beneficial interest under that certain mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.

Date of Mortgage: **7/10/2003**
Original Loan Amount: **$50,000.00**
Executed by (Borrower(s)): **MAXEL HARDY SR & CHERYL HARDY**
Original Lender: **STANDARD FEDERAL BANK N.A.**
Filed of Record: In Mortgage Book/Liber/Volume **38698**, Page **1578**
Document/Instrument No: **203473093** in the Recording District of **WAYNE, MI**, Recorded on **7/21/2003**.

Legal Description: SEE EXHIBIT "A" ATTACHED
Property more commonly described as: **12755 MONTE VISTA, DETROIT, MI 48238**

IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date: **9/11/2019**

**BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO LASALLE BANK MIDWEST, N.A., FORMERLY KNOWN AS STANDARD FEDERAL BANK, N.A., BY MERIDIAN ASSET SERVICES, LLC, ITS ATTORNEY-IN-FACT**

By: **MURAT DENIZ**
Title: **VICE PRESIDENT**

Witness Name: **ADLY SAWIRES**

3164160 BOA_Jun2019 9983708

A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT

State of **FLORIDA**
County of **HILLSBOROUGH**

On 9/11/2019, before me, **BRIAN FERRITO**, a Notary Public, personally appeared **MURAT DENIZ, VICE PRESIDENT** of/for **MERIDIAN ASSET SERVICES, LLC, AS ATTORNEY-IN-FACT FOR BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO LASALLE BANK MIDWEST, N.A., FORMERLY KNOWN AS STANDARD FEDERAL BANK, N.A.**, personally known to me, or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of FLORIDA that the foregoing paragraph is true and correct. I further certify MURAT DENIZ, signed, sealed, attested and delivered this document as a voluntary act in my presence.

Witness my hand and official seal.

(Notary Name): **BRIAN FERRITO**
My commission expires: **08/28/2023**

Brian Ferrito
NOTARY PUBLIC
STATE OF FLORIDA
Comm# GG356953
Expires 8/28/2023

3164160 BOA_Jun2019 9983708

## EXHIBIT "A"

**Parcel # 1016045177**

**LOT 377, GLENDALE GARDENS SUBDIVISION OF THE WEST HALF OF THE NORTHEAST QUARTER OF SECTION 28, T1S, R11E, GREENFIELD TOWNSHIP, WAYNE COUNTY, MICHIGAN, REC'D L 33, P 24 PLATS, WAYNE COUNTY RECORD. MORE COMMONLY KNOWN AS 12755 MONTE VISTA, DETROIT, MICHIGAN, 48238**

EXHIBIT E

7 pgs

9898

Specialized Loan
**Servicing**
Part of the Computershare Group
6200 S. Quebec St., Ste. 300, Greenwood Village, CO 80111

1-800-306-6062
1-877-875-0981

CHERYL D HARDY
12755 MONTE VISTA ST
DETROIT, MI 48238

RE: 1019837634
Property Address:
12755 MONTE VISTA ST
DETROIT, MI 48238

11/15/2023

**Trial Period Modification Plan**

Dear CHERYL D HARDY,

Attached please find the Trial Period Modification Plan discussed between you and/or your authorized agent and Specialized Loan Servicing LLC ("SLS"). To accept this offer, you must make new monthly "trial period payments." To qualify for a permanent modification, you must make the trial period payments in a timely manner and the loan must maintain an insurable lien position post recording of the modification.

**Please follow these procedures:**

- Mail your initial trial payment of $1,583.35, and any down payment as applicable, in the form of a check made payable to: Specialized Loan Servicing LLC, 6200 S. Quebec St., Ste. 300, Greenwood Village, CO 80111

OR

- Via Western Union using the blue form with the following: 1. Biller name, 2. Account number, and 3. Total amount due. Western Union may charge a fee for this service.
- To accept this offer, your initial trial payment of $1,583.35, with a scheduled payment date of 12/20/2023, must be received no later than 01/05/2024.

The period between the 12/20/2023 scheduled payment date, and the offer expiration date of 01/05/2024, is our grace period to allow you to opt into the offer.

**Next Steps**

- It is important that you thoroughly review the *Trial Agreement, Proposed Terms, Frequently Asked Questions, Additional Trial Period Plan Information, Notices Information and Definition of Terms Attached.*
- Once you have successfully made each of the payments above by their due dates, you have submitted two signed copies of your modification agreement, and we have signed the modification agreement, your mortgage will be permanently modified in accordance with the terms of your modification agreement.
- **If you miss a payment or do not fulfill any other terms of your trial period, this offer will end and your mortgage loan will not be modified.**

9898

Specialized Loan
Servicing

Part of the Computershare Group
6200 S. Quebec St., Ste. 300, Greenwood Village, CO 80111

1-800-306-6062
F 1-877-875-0981

2. The Trial Period Plan. On or before each of the following scheduled payment dates, I will pay SLS the amount set forth below ("Trial Period Payment"), which may include payment for Escrow Items, including real estate taxes, insurance premiums and other fees due and payable on my loan.

**Total Number of Payments: 3**

| Trial Period Payment Amount | Payment Schedule |
|---|---|
| $1,583.35 | 12/20/2023 |
| $1,583.35 | 01/20/2024 |
| $1,583.35 | 02/20/2024 |

The Trial Period Payment is an estimate of the payment that will be required under the modified loan terms, which will be finalized in accordance with Section 3 below. The actual payments under the modified loan terms, however, may be different.

Your trial period payment is based on your unpaid principal balance plus certain capitalized arrearages and fees, an interest rate of 4.000% and an amortization period of 60 months. Depending upon the terms of the approved workout, you may be eligible to have a percentage of your principal balance deferred. The deferred principal amount will not be subject to any interest rate charges and will not be due and payable until the earliest of the maturity date of the loan, the date you sell or transfer your interest in the property, or the date you pay off the entire interest bearing principal amount of the loan. In addition, if your existing payment includes mortgage insurance premiums, this amount will also be added to your payment.

***I understand that my first payment must be received by the Lender in accordance with the grace period described in the enclosed letter or I may not be accepted into the Trial Period Modification Plan.**

During the period (the "Trial Period") commencing on the Trial Period Effective Date and Ending on the earlier of (i) the first day of the month following the month in which the last Trial Period Payment is due (the "Modification Effective Date") or (ii) termination of this Plan, I understand and acknowledge that:

A. TIME IS OF THE ESSENCE under the Plan. This means I must make all payments on or before the days they are due;

B. Except as set forth in Section 2.C. below, SLS will suspend any scheduled foreclosure sale, provided I continue to meet my obligations under this Plan, but any pending foreclosure action will not be dismissed and may be immediately be resumed at the point at which it was suspended if this Plan terminated.

C. If my property is located in Georgia, Hawaii, Missouri, or Virginia and a foreclosure sale is currently scheduled, the foreclosure sale will not be suspended and SLS may foreclose if I have not made each and every Trial Period Payment that is due through the end of the month preceding the month in which the foreclosure sale is scheduled to occur. If a foreclosure sale occurs pursuant to this Section 2.C., this Plan shall be deemed terminated;

Specialized Loan
Servicing
Part of the Computershare Group
6200 S. Quebec St., Ste. 300, Greenwood Village, CO 80111

1-800-306-6062
F 1-877-875-0981

| Summary | Here's a summary of your proposed modified mortgage | |
|---|---|---|
| | | |
| | TRIAL PERIOD PLAN INFO | |
| **Trial Start Date** | 12/20/2023 | |
| **Number of Trial Payments** | 3 | |
| **Trial Payment Amount** | Please see the included trial agreement for the full schedule of payments and due dates. | |
| **Estimated Terms (All Figures Below)** | **Pre-Modification** | **Post-Modification** |
| **P&I Payment Amount** | $44,491.57 | $1,375.44 |
| **Escrow Payment Amount** | if applicable this amount would have been disclosed in your escrow analysis | $207.91 |
| **Total Payment Amount** | $44,491.57 | $1,583.35 |
| **Permanent Modification Start Date** | N/A | 02/20/2024 |
| **Partial Claim** | If applicable this amount would have been disclosed in your prior workout agreement | $0.00 |
| **Principal Balance** | $44,343.76 | $74,685.24 |
| **Interest Bearing Principal Balance** | $44,343.76 | $74,685.24 |
| **Interest Rate** | 4.000 % | 4.000% |
| **Loan Maturity Date** | 08/01/2013 | 11/20/2028 |
| **Amortization Term** | 121 | 60 |
| **Balloon Date** | N/A | N/A |
| **Balloon Amount** | If applicable, this amount would have been disclosed in your prior workout agreement | The estimated balloon amount will be communicated in the Final Modification Agreement |

***Please review the "Terms" page located on the last page of your agreement to further explain the numbers above.**

There is no obligation to accept this offer. Please be advised that this offer is based on estimated figures at the time the trial perio plan is printed. Once the required amount of trial payments are made, a permanent modification will be mailed. As a reminder, pe the trial period plan you must continue to make trial payments until your permanent modification documents are delivered.

**BALLOON DATE:** This estimated date represents the date that any outstanding balance is due in full as a balloon payment. Any balloon amount not paid by this date will not be setup as monthly payments. It is a lump sum amount due.

**BALLOON AMOUNT:** This amount is an estimate of what your projected balloon amount due may be when you reach your balloon maturity date. This amount may vary depending on the payment activity on your account.

*Please note that this Definition of Terms provides an explanation of the information as set forth herein and does not alter or amend any definition of terms contained in any other mortgage loan documents including the Note, Mortgage Deed of Trust, and any prior or subsequent permanent modifications thereto.

9898

Specialized Loan
Servicing
Part of the Computershare Group
6200 S. Quebec St., Ste. 300, Greenwood Village, CO 80111

P 1-800-306-6062
F 1-877-875-0981

Once you make all of your trial period payments on time and return to us two copies of a modification agreement with your signature, we will sign one copy and send it back to you so that you will have a fully executed modification agreement detailing the terms of the modified loan. Any difference between the amount of the trial period payments and your regular mortgage payments will be added to the balance of your loan along with any other past due amounts and any fees or costs that have been or will be incurred in connection with enforcement of the security agreement including those costs and fees associated with the closing and dismissal of any foreclosure action, as applicable and as permitted by your loan documents. While this will increase the total amount that you owe, it should not significantly change the amount of your modified mortgage payment.

If you are eligible and qualify for the HFA Program, after making all of your trial period payments on time, and upon our receipt of the HFA Funds, we will apply such funds first to reduce accrued and unpaid interest on your mortgage loan and any other past due amounts advanced by us under the terms of the mortgage, then to pay down a portion of the unpaid principal balance of the mortgage loan.

**Q. Are there incentives that I may qualify for if I am current with my new payments?**

No. Borrower incentive compensation is only available to borrowers who qualified for a permanent modification under the federal Home Affordable Modification Program (HAMP).

**Q. Will my interest rate and principal and interest payment be fixed after my loan is permanently modified?**

You will need to review the terms on the modification document concerning the applicable interest rate. Your new monthl payment may also include escrow for property taxes, hazard insurance and other escrowed expenses. If the cost of you homeowners insurance, property tax assessment or other escrowed expenses increases, your monthly payment will increase as well.

**Additional Trial Period Plan Information and Notices**

**We will not proceed to foreclosure sale during the trial period, provided you are complying with the terms of the Trial Period Plan:**

- Any pending foreclosure action or proceeding that has been suspended may be resumed if you fail to comply with the terms of the plan or do not qualify for a permanent modification.

**If your monthly payment did not include escrows for taxes and insurance, you are now required to do so:**

- You agree that any prior waiver that allowed you to pay directly for taxes and insurance is revoked. You agree to establish an escrow account and to pay required escrows into that account.

Specialized Loan
Servicing
Part of the Computershare Group
6200 S. Quebec St., Ste. 300, Greenwood Village, CO 80111

P 1-800-306-6062
F 1-877-875-0981

Please note that except for your monthly mortgage payment amount during the trial period, the terms of your existing note and all mortgage requirements remain in effect and unchanged during the trial period. You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect and you will comply with those terms; and that nothing in the Trial Period Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents.

If you have questions concerning this letter or need further assistance, you may contact me or Customer Resolution at 1-800-306-6059, Monday through Friday, 7:00 a.m. until 6:00 p.m. MT. SLS accepts calls from relay services. We provide translation services for individuals who indicate a language preference other than English. Se habla español.

Sincerely,

Kim, #19541
Customer Resolution Department
Specialized Loan Servicing LLC

Specialized Loan
Servicing
Part of the Computershare Group
6200 S. Quebec St., Ste. 300, Greenwood Village, CO 80111
1-800-306-6062
1-877-875-0981

- If you feel that you cannot afford the trial period payments shown above but want to remain in your home, or if you have decided to leave your home, please contact us at1-800-306-6059.
- A title review will be completed to confirm first lien insurable position. In the event that a title issue is discovered, the final modification may not be approved even if trial period payments have been received.
- If as a result of this trial plan being successfully completed and a permanent modification is completed, debt under your Mortgage Note may be forgiven and there could be tax consequences to you. Please consult your tax advisor.

**Q. What else should I know about this offer?**

Your state Housing Finance Agency ("HFA") may be participating in a program using federal Hardest Hit Funds to assist qualified homeowners to pay down a portion of the unpaid principal balance of their mortgage loans (HFA Program). If you are eligible and qualify for the HFA Program and you make your trial period payments on time, upon our receipt of the HFA Funds, we will apply such funds to the amount you owe on your mortgage loan. If we do not receive the HFA Funds and you otherwise qualify for the modification, we may still offer you a modification. **There could be income tax consequences related to payment of your debt obligation by a third party. As a result, you are advised to seek guidance from a tax professional to discuss potential tax consequences.**

- If you make your new trial period payments timely we will not conduct a foreclosure sale.
- If your loan is modified, we will waive all unpaid late charges.

- **Credit Reporting:** We will continue to report the delinquency status of your loan to credit reporting agencies as well as your entry into a Trial Period Plan in accordance with the requirements of the Fair Credit Reporting Act and the Consumer Data Industry Association requirements. **CREDIT SCORING COMPANIES GENERALLY CONSIDER THE ENTRY INTO A PLAN WITH REDUCED PAYMENTS AS AN INCREASED CREDIT RISK. AS A RESULT, ENTERING INTO A TRIAL PERIOD PLAN MAY ADVERSELY AFFECT YOUR CREDIT SCORE, PARTICULARLY IF YOU ARE CURRENT ON YOUR MORTGAGE OR OTHERWISE HAVE A GOOD CREDIT SCORE.** For more information about your credit score, go to ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm.

**Q. Why is there a trial period?**

The trial period offers you immediate payment relief and gives you time to make sure you can manage the new monthly mortgage payment. The trial period is temporary, and your existing loan and loan requirements remain in effect and unchanged during the trial period.

**Q. When will I know if my loan can be modified permanently and how will the modified loan balance be determined?**

EXHIBIT 'F'

2 P85

Social Security Administration
**Benefit Verification Letter**

*0101BEV4J5UVN8F* CCM.M72.BEV4J.R240611

Date: June 11, 2024
BNC#: 24A2192B61832
REF: A, DI

CHERYL DENISE HARDY
12755 MONTE VISTA ST
DETROIT MI 48238-3085

You asked us for information from your record. The information that you requested is shown below. If you want anyone else to have this information, you may send them this letter.

**Information About Current Social Security Benefits**

Beginning December 2023, the full monthly Social Security benefit before any deductions is $284.00.

We deduct $0.00 for medical insurance premiums each month.

The regular monthly Social Security payment is $284.00.
(We must round down to the whole dollar.)

Social Security benefits for a given month are paid the following month. (For example, Social Security benefits for March are paid in April.)

Your Social Security benefits are paid on or about the third of each month.

**Information About Past Social Security Benefits**

From August 2023 to November 2023, the full monthly Social Security benefit before any deductions was $275.20.

We deducted $0.00 for medical insurance premiums each month.

The regular monthly Social Security payment was $275.00.
(We must round down to the whole dollar.)

**Type of Social Security Benefit Information**

You are entitled to monthly retirement benefits.

**Information About Supplemental Security Income Payments**

Beginning May 2024, the current Supplemental Security Income payment is $679.00.

See Next Page

This payment amount may change from month to month if income or living situation changes.

Supplemental Security Income Payments are paid the month they are due.

(For example, Supplemental Security Income Payments for March are paid in March.)

We found that you became disabled under our rules on March 20, 2008.

**Type of Supplemental Security Income Payment Information**

You are entitled to monthly payments as a disabled individual.

**Medicare Information**

You are entitled to hospital insurance under Medicare beginning September 2023.

You are entitled to medical insurance under Medicare beginning September 2023.

Your Medicare number is 7XM6GR1XN48. You may use this number to get medical services while waiting for your Medicare card.

If you have any questions, please log into Medicare.gov, or call 1-800-MEDICARE (1-800-633-4227).

**Date of Birth Information**

The date of birth shown on our records is September 20, 1958.

**Suspect Social Security Fraud?**

Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline at 1-800-269-0271 (TTY 1-866-501-2101).

**If You Have Questions**

**Need more help?**

1. Visit www.ssa.gov for fast, simple and secure online service.
2. Call us at **1-800-772-1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1-800-325-0778**. Please mention this letter when you call.
3. You may also call your local office at **1-866-365-6741**.

SOCIAL SECURITY
SUITE 375
7800 W. OUTER DR
DETROIT MI 48235

**How are we doing?** Go to www.ssa.gov/feedback to tell us.

*Social Security Administration*

SOCIAL SECURITY ADMINISTRATION
9222 GRAND RIVER AVE
DETROIT, MI 48204-2249

EXHIBIT 'G'

3 PGS

FEBRUARY 26, 2024

CHERYL HARDY
12755 MONTE VISTA ST
DETROIT, MI 48238

RANDALL S. MILLER & ASSOCIATES
43252 WOODWARD AVE, STE 180
BLOOMFIELD HILLS, MI 48302

MAILING BY PS FORM 3817

Re: DISPUTE OF DEBT IN ITS ENTIRELY FOR CASE NUMBERL: 23MI00423-1

Sir or Madam:

This is a request for verification as this alleged debt which is in dispute in its entirely. I am not refusing to pay a debt which I lawfully owe, but I need verification of the debt before we can proceed. Please answer the following questions relating to the disputed account and return them to me within thirty (30) days, with your Affidavit which validates the answers. If you need more time, or if you need any questions restated, please make your request to me in writing.

This letter is your NOTICE under the authority of The Fair Debt Collections Practices Act that contacting me again regarding the above referenced alleged debt, after the verifiable receipt of this notice without providing procedurally proper validation of the debt, establishes that you, have used interstate communications in a scheme of fraud by using threat, intimidation, deception, and enticement to coerce a person to commit some act creating a legal disability where none exists.

However, I am willing to communicate with you as a consultant for a fee of $10,000.00 U.S. Dollars per letter, and $10,000.00 per phone call, so if you write or call again, absent the proof required below, it will comprise your contractual agreement to pay my consultation fees.

Please state the name, occupation and mailing address of the person answering the following questions.

Please furnish a copy of the contract which your company has with me in regard to this alleged debt.

Please identify what you loaned to me. Did you loan me cash, credit, or a debt instrument?

Please produce the account and general ledger statement showing the full account of the alleged obligation that you are now attempting to collect, verified (sworn true, correct and complete) by the party who made the entries.

Please identify by name and address all persons, corporations, association, or any other parties having an interest in legal proceedings regarding the alleged debt.

Please verify under penalty of perjury that as a debt collector, you have not purchased evidence of debt and are proceeding with collection activity in the name of the original creditor.

Please obtain verification from the original creditor, under penalty of perjury, that the creditor did not receive reimbursement from its insurance company in an amount exceeding the amount of the alleged debt, as is the customary policy of lenders.

Please verify under penalty of perjury that you know and understand that certain clauses in a contract of adhesion, such as a so-called forum selection clause, are unenforceable unless the party to whom the contract is extended could have rejected the clause with impunity.

Please verify under penalty of perjury that you know and understand that credit card contracts are a series of continuing offers to contract and as such are non-transferable.

Please provide verification from the original creditor that you are authorized to act for them.

Please verify that you know and understand that contacting me again after receipt of this notice without providing procedurally proper validation of the debt constitutes the use of interstate communications in a scheme of fraud by advancing a writing which you know is false with the intention that others rely on the written communication to their detriment.

Please verify that you know and understand that contacting me again after receipt of this notice without providing procedurally proper validation of the debt constitutes acceptance of my contract terms to pay me consulting fees of $10,000.00 U.S. Dollars per letter and $10,000.00 per phone call.

Please take **NOTICE** that this debt is hereafter disputed in its entirety, upon receipt of this letter.

Disputing the "debt"

By ______________________________, Agent without recourse

Note: A copy of the consumer credit contract is not sufficient to validate the debt. Validation requires presentment of the account and general ledger. Statement signed and dated by the

party responsible for maintaining the account. *Pacific Concrete F.C.U. v. Kauanoe, 62 Haw. 334, 614 P.2d 936 (1980), GE Capital Hawaii, Inc. v. Yonenaka 25 P.3d 807, 96 Hawaii 32, (Hawaii App 2001).*

Cc: Consumer Response Center
Federal Trade Commission
Washington, D.C. 20580

EXHIBIT 'H'

1 / 28

# ASSISTANT SECRETARY'S CERTIFICATE

# OF

# BANK OF AMERICA, NATIONAL ASSOCIATION

The undersigned, Devra Lindgren, an Assistant Secretary of Bank of America, National Association (the "Association"), a national banking association organized and existing under the laws of the United States of America and having its principal place of business in the City of Charlotte, County of Mecklenburg, State of North Carolina, does hereby certify that:

1. Effective October 31, 1986, **Family Federal Savings and Loan Association**, Saginaw, Michigan, was merged into and under the charter and title of **Heritage Federal Savings Bank**, Taylor, Michigan.

2. Effective December 4, 1993, **Heritage Federal Savings Bank**, Taylor, Michigan, was merged into and under the charter and title of **Standard Federal Bank**, Troy, Michigan.

3. Effective October 5, 2001, **Standard Federal Bank**, Troy, Michigan, OTS Number 0161, merged into and under the charter of **Michigan National Bank**, Charter Number 16660, under the title **Standard Federal Bank National Association.**

4. Effective September 12, 2005, **Standard Federal Bank National Association,** Charter Number 16660, changed its name to **LaSalle Bank Midwest National Association.**

5. Effective October 17, 2008, **LaSalle Bank Midwest National Association,** Troy Michigan, Charter Number 16660, merged into and under the charter and title of **Bank of America, National Association,** Charlotte, North Carolina, Charter Number 13044.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Association this 13th day of June, 2013.

(SEAL)

Devra Lindgren

Devra Lindgren
Assistant Secretary

# CIVIL COVER SHEET

County in which action arose: WAYNE

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Cheryl Hardy

**(b)** County of Residence of First Listed Plaintiff: Wayne
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
12755 MONTE VISTA ST
DETROIT, MI 48238 (313)828-3412

**DEFENDANTS**
SPECIALIZED LOAN SERVICING
MEB LOAN TRUST III
BANK OF AMERICA N.A

County of Residence of First Listed Defendant: WAYNE
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [X] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [X] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [X] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*
- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: My house free + clear title, 100,000 Cash
Brief description of cause:

**VII. REQUESTED IN COMPLAINT:**
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [X] Yes [ ] No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*:
JUDGE ______ DOCKET NUMBER ______

DATE
January 27, 2025

SIGNATURE OF ATTORNEY OF RECORD
Cheryl Hardy

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______

Case: 2:25-cv-10244
Assigned To : DeClercq, Susan K.
Referral Judge: Patti, Anthony P.
Assign. Date : 1/27/2025
Description: CMP HARDY V. SPECIALIZED LOAN SERVICING ET AL (TH)

PURSUANT TO LOCAL RULE 83.11

1. Is this a case that has been previously dismissed?

☐ Yes
☒ No

If yes, give the following information:

Court: N/A

Case No.: ____

Judge: ____

2. Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)

☐ Yes
☒ No

If yes, give the following information:

Court: ____

Case No.: ____

Judge: ____

Notes :